Operations, Mr. Carroll. May it please the Court, I'm Ken Carroll from Carrington Coleman here on behalf of Martin Marietta and TXI, which I will refer to collectively as Martin Marietta. Before I go into the contested issues that bring us here today, I think it's helpful, important really, to pin just a handful of uncontested facts that supply the essential context for this dispute. First, geography. The properties that are involved in this case are separated by the Colorado River, a unique factor. Martin Marietta's mining operationalize on the south, Good River's pecan plantation on the north, directly opposite. Both are situated right on the river, and because of that, much of that area lies on a hundred-year flood plain, including all of the parts of Good River that flooded on October 30, 2015, the date of the events that led to this case. Second, the conditions. On the day that Good River Farm flooded, it had been raining a lot for a long time. Both experts concurred that what that little area was looking at was characterized properly as a 120-year flood event, and so the portions of Good River Farm that lay in the hundred-year flood plain flooded, as did much of Martin Marietta's property and its operations. Now, we're here today because Good River managed to secure a judgment holding Martin Marietta liable for the flooding on Good River's property under the Texas Water Code and under general negligence theory. A jury determination. A jury determination, correct. There's a lot for us to overcome in order to be able to give you the relief that you're requesting. It is, it is, and we acknowledge that from the start, but I will say it's not, it's not unprecedented. This court, less than two weeks ago in the feral gas case in which Judge Smith was involved, overturned a jury verdict and the denial of Rule 50 motions, which is the same relief we're looking for. It happens, and we think it should happen here. There are problems with this judgment, but there's one fundamental threshold issue that really stands out. It's, it's one that if you pull that thread, the entire fabric of the plaintiff's case unravels, and that is, to sustain its claims under either the Water Code or for negligence, Good River had to prove with legally let's call it Martin Marietta water. Water that had been impounded on Martin Marietta's side of the river, and that somehow then made its way across that river in flood stage and inundated Good River's property, and conversely, that it was not flood water from the Colorado River itself. It remains surface water. Well, that's another issue, a sub-issue, I would say. We've argued that, in fact, it does have to retain its character as surface water. At the very least, it has to be the same water that was on the south side of the river that somehow made it across over to the north, rather than water from the river. The same molecules. Yes, the same molecules for an oil and gas lawyer, exactly. Because if you look at, for example, the TWU case, which is cited by both parties, a very different set of circumstances, but the court recognized much the same legal situation. The issue, the determination of whether the waters that flooded TWU, the plaintiff, are surface waters or flood waters is important because diffused surface waters would be actionable under section 11.086 and general negligence theories. Flood waters would not, that's at pages 278 and 279 of the opinion. Here, we submit that . . . That was which opinion? I'm sorry, which . . . That's the TWU case that we submit that Good River just didn't get there in this case. In fact, their own expert opined that it was not Marietta water that flooded the farm. Now, the court's approach to this, I think, devolves to two questions. One, why does Good River have to prove that the water that inundated its farm was water from Martin Marietta's side? And two, did they do that? Did they prove it? The answer to the first question, why, varies a little depending on the legal theory. The water code, of course, provides a statutory cause of action, and so that cause of action is defined and confined by the words of the statute itself. And section 11086 says, no person may divert or impound the natural flow of surface waters in a manner that damages the property of another by the overflow of the water diverted or impounded. The very water that's diverted or impounded has to be the water that floods the other side and damages it. Now, back to the facts, which I appreciate you're going over the facts. As I understand it, so the water on your client's property was moving from north to south, but in the river it moves east to west at that point. Is that right? I believe the allegation in the testimony was that the water, once it got to Good Riverside, was moving northward, from south to north. But yes, it was moving perpendicular to the river flow, correct, once it got to the Good River property. But what we found, there is testimony, of course, that explains that that happened because once the water gets over on the Good River side, it moves downhill to the lower areas of the property, which is to the north, away from the river bank, and that's why that happened. Is it disputed that there was sand and gravel inundated in the water that was found on the other side? I don't believe that there's any indication of that. I think one of the things that we find here is that there's simply no way to differentiate or identify water from Good River side of the river to, excuse me, Mark Marietta side to Good River. It's not like the water on our side of the river was red and the water in the river was blue, so that once it got over there, it's just water, I believe is the answer. Now there has been, as Judge Smith asked, we've gone back and forth a lot about whether the plaintiff also has to prove that the water retained its character as surface water once it flooded that property. We submit that under TWU and the Bonin cases and others, the answer to that is yes. The language of the statute, we think, supports that, but I also acknowledge that recently, we've had some cases, the district court's opinion here, the Austin Court of Appeals in Golden Corral, one of the Houston Courts of Appeals in the Tanaris Bay case, have taken a slightly different view. They've said as long as it's surface water when it's impounded, the character can change, not to floodwaters, but it can stop being surface water and when it does the damage and it's still actionable. We may get an answer to that pretty soon because, well, I don't know about soon, because the defendant in Tanaris Bay has filed a petition for review in the Texas Supreme Court, which would include that question. The court has asked for a response, it's gotten it, but it hasn't gotten a response. I don't know whether or not, but at least it's up there and it's presented, but I'd submit that this court, you don't even need to resolve that question, that potential conflict among those authorities, because at the very least, they have to prove that the water that flooded the farm was the water that was impounded on Martin Marietta's side of the river, because that's what the common law doctrine on floodwaters, the overflow from streams and rivers, and there's no dispute, as the district judge said in overruling our Rule 50 motion, the parties don't dispute that floodwaters are not the responsibility of private individuals and there's no liability for floodwaters. TWU, as I read, said it, and of course others do. The Bonin II case exemplifies it, because that's a case, of course, that the defendants deliberately released surface water into the Sabine River, which then caused massive flooding downstream, and the Bonin II court said in that circumstance, notwithstanding the impounding of surface water and the deliberate release thereof, the damage was caused by floodwaters for which no one bore responsibility except the state and for which there was no cause of action under general negligence theory. The plaintiff in this case has given you no cases that criticize or overrule Bonin II. Of course, Bonin II was affirmed by this court, albeit on the grounds of some briefing deficiencies, so that's still good law. So that takes us to the second question. Did Good River prove that Martin Marietta water somehow magically crossed over the raging Colorado River to land on the other side to flood the pecan farm? And our position is clearly no, and therefore that this is a case that should never actually have gone to the jury. It should have been granted judgment as a matter of law before that. There is clearly no direct evidence. Stephen and Turner Wembley, the two of their employees, Mr. Garcia, Mr. Lopez, they were there and they did offer some testimony, but neither testified that they actually saw water come from Martin Marietta's side, cross the river, and get over onto Good River's side of the river. One of them said he saw water coming over the top of the berm, the pit wall. He also said he couldn't even see the bank on the other side, much less see water come across the river and onto Good River's property. The other said, what I saw was water coming up the bank, but he didn't see the source of that water, and water coming up the bank is consistent with floodwaters. That's what it is. And as, well, what of course, as Judge Douglas alluded to, what do you do with the fact that they're entitled to all these inferences and deference here? That's true, so there might be a temptation to try to stitch together all the little things that don't quite get there, but do get you there if you take inferences. But a jury and a judgment is not entitled to unreasonable inferences. And neither a jury, nor I'd submit any court, is entitled to check its common sense or basic science when it comes to its conclusion in a case like this. Water impelled only by gravity simply cannot fly, or walk, or skate over the water in the raging Colorado River that, according to testimony, was flowing at a rate of 121,000 cubic feet per second at the time this flood occurred. It just doesn't happen. Well, there is one way that one might have gotten there. This is one of the things that we talked about. If Good River had produced expert testimony, where someone could have testified, okay, this is how this impossible thing could have happened, whether it did or not. We can tell you how it could have happened, because that clearly would be something that's not, you'd have to have expert testimony, that it's not in jurors' common understanding, as the standard goes, about how water could, in the circumstances, have gone from Martin River to the Colorado River. Well, Good River did have an expert, Mr. McIntyre, but he actually said the exact opposite. Twice he said, first at page 3790 of the Record on Appeal in his report, that the hydraulic rise and redirection of the river flow to the north rapidly flooded a large portion of the farm. The river flow flooded a large portion of the farm. Then he reiterated, seven pages later in his report, that the diversion of river flow to the north went over the farmland. So their own expert tells you that it's not Martin Marietta water that floods the farm. It's river flow, and river flow, by definition, is floodwaters for which Martin Marietta has no responsibility and no legal liability. Now, I want to take just a moment to look at one other issue. We talked about the absence of evidence of proximate cause, actually but-for cause in our situation. That is, did they produce legally sufficient evidence of specifically what Martin Marietta did or didn't do wrong, that without that, there would have been no flood. Well, Mr. McIntyre, the expert, in his report, not so much in his oral testimony, but in his report, he talks a lot about criticism of the way that the pit wall on Martin Marietta's property was built, but he never draws that last thread that says, if we'd done everything that he says we should have done or hadn't done the things he said we shouldn't have done, would there not have been a flood? This was, again, a 120-year flood event. How impervious did this pit wall have to be? And there is no testimony that established-that establishes that if we had done everything he says we should have done, there would not nevertheless have been water overcoming or overtopping, as I said, the pit wall that goes wherever it goes and that there would have been a resultant flood on Good River's property. Because Good River failed to produce legally sufficient evidence that the water that flooded its property was Martin Marietta water, as I said, this case should never have gone to the jury. So we ask the court to reverse and reconsider. Thank you, Mr. Carroll. You've saved time for rebuttal. Mr. Phillips? Thank you, Your Honor. It has pleased the court. My name is Travis Phillips here on behalf of the appellee, Good River Farm. The first thing I'd like to pick up on is one of the issues that I think both sides have struggled with in this case is that it has presented a factual distinction from almost all other case law that the party has been able to cite to, and that is that when looking at flood and inundation cases, almost inevitably you're dealing with a fact scenario where water enters into the channel and travels down the channel before ultimately flooding or inundating another property. You don't have that factual issue, as Mr. Carroll had referenced a moment ago, where you have the two properties directly across from each other with a channel bed in between. The Tanaris case that was referenced is the first case that either party has seen that directly addresses that issue because in Tanaris, the defendant raised the issue that the water must necessarily have crossed a channel before flooding the relevant properties and alleged that therefore must have been flood water. Now, Tanaris, like the 2016 Austin Court of Appeals Golden Corral case, makes the distinction, of course, that the key point for 11.086 of the Water Code is that you look at what was actually diverted or impounded. If it's surface water, it doesn't matter if that water's nature then changes. What matters is that you're able to draw that causal connection to the initial impoundment or divertment of surface water. I make that point because the fact that water was impounded on the Martin Marietta property has not really been an issue. Among the facts that were just uncontested in the case is that the Martin Marietta property consists of a series of pits that they do naturally fill with water. The question of water being impounded, like I said, not an issue. The question becomes factually what evidence existed as to the impoundment of that water on the day of the incident. Now, John McIntyre, who was Appley's expert, testified that over 800 acres of land drained into the Martin Marietta site in 2015. So you have a significant catchment basin from which diffused surface waters can drain and pond in the Martin Marietta site. He further testified directly in part of his direct and as part of his joint exhibit report that was submitted to the jury that the site, including the existence of a higher midpoint ridge as that land had been modified, would act to pool and build up the water. That points to another distinct factual issue, and I think this is one on where the case really turns, the timing. Direct testimonial evidence from Dennis Schewitz, an employee of the Martin Marietta site, was that the Martin Marietta site had begun retaining water at 7 a.m. on the morning of the incident. That they had to close the site and evacuate by 3 o'clock that day because the water had backed up all the way to the front gate, and that it was three feet deep at their office. Testimonial evidence provided by the two employees of Good River Farm, however, established that as of 3 p.m. there was no flooding on the farm. In fact, Good River Farm's employees didn't experience flooding and this is important because there's no way to explain how you have so much water on the Martin Marietta site, and hours later you're only beginning to get water on the Good River Farm site, unless there's some difference between the sites. In fact, part of the testimony that John McIntyre provided pointed to a potential difference in the elevations of the sites, such that water could be The other point that I think is significant in this case, Your Honor, that bears consideration is the distinction between the direct testimonial evidence versus the expert modeling. Both experts agreed as to the flow calculations and modeling for the river, that based on the hydrant net data, for rain gauge data, river level data, that the maximum rise of the Colorado River would have occurred about 5 o'clock. But the direct testimony established that you didn't get water on Good River until 6 o'clock, and in fact that at 7 o'clock a boat rescue is necessary for the workers, one of the workers and his sons, indicating you still have a significant and strong current. According to that same model as seen in the testimony of John McIntyre, at 7 o'clock that evening the river should have already been receding at a rate about one to one and a half feet per hour. There is a distinction between the direct testimonial evidence provided to the jurors and the expert modeling. That raises the issue, if the river is already receding at the time this flow of water is occurring on the Good River property, where is that flow of water deriving from? We know from the testimony that was brought in by Mr. Schwartz that for hours water had been We know from the direct testimony of the workers that at approximately 6 to 630 p.m. that day, water was seen coming over the earthen embankment that Martin Murrieta had constructed on the south side of Colorado River. In other words, indicating that there was a flow of water coming off the Martin Murrieta side going toward the north. Both of those workers then testified that the current from which one worker had to be rescued was a northward current. We also have evidence that this flood event was unique compared to all other historical events on the property going back to the 1950s, and that damage such as was sustained in this event was completely different from all other prior floods. There had never been water getting into the buildings. There had never been water ripping out the back of the buildings and scattering the harvested crop, for example. All of that points to unique circumstances. The unique circumstances in place as compared to historical floods was the Martin Murrieta side. Now, the next point I would raise to the court is simply that in looking at a motion for judgment as a matter of law, the question for the jury, so the question for the fact finder more accurately, would be whether or not there's a substantial conflict in the evidence where the jury has to weigh the evidence, has to make a decision as to the credibilities. It has to be more than a scintillative evidence. There has to be something there for the jury to consider. In the present case, based on the evidence that was adduced at trial and the over 100 different joint exhibits that were provided to the jury, it was well possible for them to look at these circumstances and say, as a reasonable inference, if the flood is already receding on the river and you have a massive source of water nearby, with water spilling over from that source, it makes sense. That would be the source of the flood. That is a reasonable inference. Earlier, the court asked about the issue of flood water versus surface water, and I did touch on that briefly, but I would note to the court as well that the Valley Forge case of Houston First District Court of Appeals in 2004 directly addressed that you can have an admixture of both flood water and surface water causing damage. That points, I think, again to the analysis we see in Tenoris and in Golden Corral that whether or not it was flood water or a mix of flood water and surface water at the time the Good River Farm was impacted does not change the causation element, which is the diffused surface water was being impounded and that that is the source of the damage ultimately suffered. So it's surface water when it's impounded and therefore it's surface water when it arrives on the other side of the river. Is that what you're saying? Your Honor, that is one issue that came up at trial and was also discussed in the trial court's judgment. Essentially, it comes down to a definitional concern. So surface water is generally defined as being diffused water that runs with the land. It has no defining features. It's not going to come into a specific channel. When it comes into a specific channel, it forms a specific body of water. It's no longer diffused surface water because it's under control of that channel. But the issue is if you have surface water running over and across a channel, which is implicit in the fact finding made by the jury, is that still surface water? Because it's not confined to a channel. It's not under the control of the channel. It's still diffused in the sense that it's, I'm going to use this term, broad spectrum. It hasn't been confined. It hasn't been directed into a specific flood. Your friend on the other side said that there was no evidence that there was sand and gravel found on the Good River side of the Colorado River. But did Mr. Wimberly testify that there was sand and gravel located on the other side of the Colorado River? Yes, Your Honor. How does that play into the facts that were weighed by the jury? Certainly. Your Honor, Mr. Turner Wimberly testified on his direct and his redirect both as to the fact that some sand and gravel had been found in the debris field after the flood event the day after. Other hallmarks of the debris field, of course, was significant scouring of the trees indicating the strength of the flow. One of the pertinent aspects that Mr. Wimberly was able to point to is that you could trace the day after where the flooding had been by the presence of the debris field where you had mud and grit and river sand and gravel as well as things that had clearly just flooded out of the office buildings maintained on the site. Anything else, Mr. Phillips? No, Your Honor. Thank you, Mr. Carroll for rebuttal. Just to pick up again on the very last question that Judge Douglas raised, even if one grants that there was some testimony about finding some sort of gravel in the debris field, to my knowledge, there was no testimony that traced that gravel to Martin Marietta's property on the other side. The gravel didn't have Martin Marietta logos on it. There was nothing to say where it came from, whether it came from the riverbed, whether it came from the bank of Martin Marietta, which is the same kind of soil and came across that way. It came from the riverbed on Good River side. Again, there would be no basis to say that that is sufficient proof that the water came, particularly, again, in the context of the physical impossibility that we're talking about here. Water coming from one side of the river, somehow magically flying over onto the other. There is no question of whether water retains its characteristic as surface water. Again, the jury in this case, Mr. Phillips has said and the trial court said that they tried to raise this issue that there has to be some sort of flow. The water has to flow with the river before it loses its character. In the first place, the jury wouldn't instruct on that and there's a good reason for it. It ain't the law. There are circumstances where in fact the water does flow, surface water does flow, and therefore loses its character. But in Dietrich and in TWU and other cases, they make the point that what happens is the water loses its character as surface water as soon as it reaches the bank and can do so even if the watercourse at the time that it reaches it is dry, which I think, by the way, is a situation in Tanaris Bay. In fact, that was the instruction here that surface waters continue to be such until it reaches some better channel and ceases to be such when it enters a watercourse in which water is accustomed to flow. So there is no flow requirement. The thing I think that to me as I listen to Mr. Phillips describe this is you still, A, you have no explanation for Mr. McIntyre's opinions that what flooded here was not Martin Marietta water, but was river flow, which would be flood waters for which Martin Marietta bears no responsibility. But that's where we have a jury, right? Well, respectfully, no. If there is no, if there's no, if there is no legally sufficient evidence to raise a question about whether it was surface water, water from Martin Marietta's side, or flood waters, then no, it doesn't go to the jury. And that, under the circumstances, we contend is what we have. No direct testimony . . . Well, even the evidence that's been discussed here about the gravel, the jury could place weight on that evidence or not, as it shows, hearing all the evidence and all the witnesses together. Well, again, I know there's a temptation to do that because of the deference to be given to the jury, but we're talking about a physical impossibility. Do a few pieces of gravel explain water flying over a river in flood stage? This is like Bonin, Your Honor, where there was no dispute that the water was released, surface water was released, and that caused the downstream flooding. No question about that. And yet, the Court said there's no liability under the water code or under general theories of negligence. The same thing we submit obtains here. They did not prove that the water that flooded Good River came from Martin Marietta's side. They couldn't do so. And so, we're entitled to have that judgment reversed and rendered for Martin Marietta. Thank you. Thank you, Mr. Carroll. Your case is under submission.